1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ADRIAN FULLER,

        Plaintiff,

    v.

MICHAEL CHERTOFF, *et al.*,

        Defendants.

CASE NO.  C05-1308RSM

MEMORANDUM ORDER
GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

## I.  INTRODUCTION

This matter comes before the Court on defendants' Motion for Summary Judgment.  (Dkt. #22).  In this alleged employment discrimination action, defendants argue that plaintiff cannot support his disparate treatment claim because he was not qualified for his position, he was not treated differently from anyone similarly situated to him, and he was terminated for legitimate, nondiscriminatory reasons.  Plaintiff responds that summary judgment is not appropriate because he has produced substantial evidence demonstrating that he was terminated based on discriminatory reasons, and that defendants' proffered reasons are pretextual.  (Dkt. #32).  For the reasons set forth below, the Court disagrees with plaintiff, and GRANTS defendants' motion for summary judgment.

## II.  DISCUSSION

### A.  Background

This lawsuit arises from plaintiff's termination as a Customs Inspector ("CI") for the United

MEMORANDUM ORDER
PAGE - 1

States Customs Service in Blaine, Washington.[1]  In December 2002, plaintiff, a 36-year-old African-American, attended Customs Inspector Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia.  He trained from December 12, 2002, to February 14, 2003.  After completing his training with an 81% score, he began working as a CI on February 18, 2003.  Plaintiff's first year was considered a probationary period, during which he could be terminated without cause.

Plaintiff's first six weeks of employment were On the Job Training.  Supervisory Customs Inspector ("SCI") Scott Ichikawa was assigned as a mentor to plaintiff for that training.  SCI Ichikawa supervised plaintiff for the first four weeks, but then attended his own training and was absent for the last two weeks, leaving plaintiff to be supervised by whichever supervisor was on duty during that time.  On March 30, 2003, SCI Ichikawa gave plaintiff satisfactory ratings in all 128 applicable categories.

On April 23, 2003, plaintiff received his mid-year review.  At that time, SCI Becky Elston rated plaintiff competent in four categories: job knowledge, technical skills, professional application and working with others.

According to defendants, after that time, it began to become apparent that there were serious performance problems with plaintiff's job performance.  In April and May 2003, SCI Charles Heath reported to Chief Philip Stanford that plaintiff was not taking on his fair share of job responsibilities and was making remarks to the traveling public that could be construed as threats.  SCI Heath also states that he informed plaintiff's subsequent supervisor, SCI Marc Crooks, of the problems he observed.

On August 23, 2003, Chief Stanford received an e-mail from SCI Elston stating that,

---

[1] The Court acknowledges that in March 2003, the Customs Service became part of the U.S. Customs and Border Protection in the Department of Homeland Security.  The position of Customs Inspector no longer exists, and has been replaced by the position of Customs and Border Protection Officer.

MEMORANDUM ORDER
PAGE - 2

although she was not plaintiff's direct supervisor, she had noticed several areas where plaintiff was deficient, including lack of knowledge of various inspector duties he was required to perform, and failure to understand basic concepts.  She also stated that he regularly passed his work off on other inspectors, and that he was not trying very hard to improve his performance as an inspector.

On August 25, 2003, Chief Stanford sent an e-mail to all of the SCIs at Blaine stating that he had received several negative reports about plaintiff and he wanted a "no nonsense" assessment, specifically, whether he was "a keeper" or whether they should "cut their losses."  SCI Roman Morin, SI Susan DeLucia and Supervisor Lance Obra subsequently responded with more complaints. In the same time period, SCI Crooks sent out a similar e-mail asking for feedback about plaintiff's performance and apparently received no response.

Senior Inspector ("SI") Donna Young also reported problems with plaintiff during that time frame.  She reported having seen plaintiff intimidate a 15-year-old boy who had been taken off a bus on suspicion of concealing marijuana.  She reported that plaintiff had not followed Port policy and had violated every procedure during the encounter.  Plaintiff vehemently denies that he acted improperly during this incident, calling SCI Young's description of the events an overblown exaggeration.

On August 28, 2003, plaintiff asked to meet with Chief Stanford to discuss performance issues.  During that meeting Chief Stanford suggested that plaintiff receive additional training. Plaintiff became angry and confrontational and walked out of the meeting, refusing any further training.  However, after a couple of hours had passed, plaintiff returned to Chief Stanford and told him he would accept one day of additional training.

On September 10, 2003, CI Thomas LeCompte was assigned to work with plaintiff. Defendant asserts that this was the additional day of training.  CI LeCompte apparently believed that the purpose of the day was an evaluation of plaintiff's skills, not for particular training, and spent much of his time away from plaintiff doing his own work.

MEMORANDUM ORDER
PAGE - 3

1    On September 13, 2003, plaintiff was working at the Peace Arch border crossing when Chief

2    Stanford drove in from Canada with his wife.  Chief Stanford states that plaintiff did not appear to

3    recognize him and questioned him in an inappropriate manner.  Chief Stanford apparently addressed

4    all of these issues with plaintiff's supervisor, CSI Crooks, at an informal supervisors' meeting.

5    On September 20, 2003, SCI Crooks rated plaintiff as "successful" on his year-end

6    performance appraisal.  SCI Crooks found that plaintiff was able to do the job of Customs Inspector.

7    At the end of September, Chief Stanford again requested comments on plaintiff's progress.

8    SCI Heath responded on two different occasions with more complaints about plaintiff's job

9    performance.  SCI Elston also responded with more complaints.  As a result, Chief Stanford

10   recommended to Area Port Director Peg Fearon that plaintiff be terminated.  Chief Stanford then

11   forwarded the supporting documentation to the Labor and Employment Relations ("LER") office.

12   After reviewing the information, Ms. Fearon agreed that plaintiff should be terminated and passed

13   that recommendation on to Thomas Hardy, Director of Field Operations.   LER Specialist Steven

14   Barnanowski then presented the case to Mr. Hardy.

15   In the meantime, on October 6, 2003, plaintiff extracted a driver from his car and handcuffed

16   him on the mistaken belief that the driver had a criminal warrant in the NCIC computer.  When

17   plaintiff realized his error, he released the driver.

18   On October 8, 2003, plaintiff was terminated.  Plaintiff was informed that his termination was

19   due to failure to retain training, rejection of additional training, intimidation and threats to the

20   traveling public, and failure to respond well to constructive criticism.  Mr. Hardy acknowledged that

21   plaintiff had recently received a "successful" evaluation, but determined that the evaluation was

22   flawed because it was premature, prior to the end of the performance year, and had not been made

23   with all available information.

24   On October 9, 2003, plaintiff contacted the Seattle Equal Employment Opportunity

25   Commission ("EEOC"), and inquired about filing a complaint.  He filed his official complaint on

26

MEMORANDUM ORDER
PAGE - 4

November 17, 2003.  Between February 15 and March 2, 2005, a five day trial took place before

EEOC Judge Zulema Hinojos-Fall.  On March 21, 2005, Judge Hinojos-Fall issued a 31-page

opinion finding no discrimination had occurred.

The instant action followed.

**B.  Summary Judgment Standard**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   The Court must draw all

reasonable inferences in favor of the non-moving party.  *See F.D.I.C. v. O'Melveny & Meyers*, 969

F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds,* 512 U.S. 79 (1994).  The moving party has

the burden of demonstrating the absence of a genuine issue of material fact for trial.  *See Anderson*,

477 U.S. at 257.  Mere disagreement, or the bald assertion that a genuine issue of material fact

exists, no longer precludes the use of summary judgment.  *See California Architectural Bldg.*

*Prods., Inc., v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

Genuine factual issues are those for which the evidence is such that "a reasonable jury could

return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.  Material facts are those

which might affect the outcome of the suit under governing law.  *See id.*  In ruling on summary

judgment, a court does not weigh evidence to determine the truth of the matter, but "only

determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549

(9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).  Furthermore, conclusory or

speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment.

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 60 F. 3d 337, 345 (9th Cir. 1995).

Similarly, hearsay evidence may not be considered in deciding whether material facts are at issue in

summary judgment motions.  *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F. 2d 665, 667 (9th Cir.

1   1980).

2   **C.  Impermissive Overlength Brief**

3   The Court first addresses plaintiff's Response to the instant motion.  The length of plaintiffs'

4   Response is governed by CR 7(e)(3).  Under that Rule, responses to motions for summary judgment

5   are not to exceed 24 pages in length.  However, plaintiff's response is 26 pages in length.  Plaintiff

6   has failed to ask for, or receive, permission to file such overlength brief.  Accordingly, the Court will

7   STRIKE the overlength pages, and will consider only those facts and arguments presented in the first

8   24 pages.

9   **D.  Title VII Discrimination**

10   In his Complaint, plaintiff alleges wrongful termination based on his race in violation of Title

11   VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq*.  Title VII makes it unlawful for an employer

12   to "discriminate against any individual with respect to his compensation, terms, conditions, or

13   privileges of employment, because of such individual's race. . . ."  42 U.S.C. § 2000e-2(a)(1) (2005).

14   A person suffers disparate treatment in his employment "'when he or she is singled out and treated

15   less favorably than others similarly situated on account of race.'"  *See McGinest v. GTE Serv. Corp.*,

16   360 F.3d 1103, 1121 (9th Cir. 2004) (internal quotation marks omitted) (quoting *Jauregui v. City of*

17   *Glendale*, 852 F.2d 1128, 1134 (9th Cir. 1988)).

18   To establish a *prima facie* case of wrongful termination under Title VII, plaintiff must offer

19   proof that: (1) he was a member of a protected class; (2) he was performing his job in a satisfactory

20   manner; (3) he suffered an adverse employment action; and (4) other similarly-situated employees

21   who were not members of the protected class were treated more favorably.  *Aragon v. Republic*

22   *Silver State Disposal, Inc.*, 292 F.3d 654, 659 (9th Cir. 2002).

23   Title VII discrimination claims are subject to a two-part, burden-shifting test.  *Cornwell v.*

24   *Electra Cent. Credit Union*, 439 F.3d 1018 (9th Cir. 2006).  Establishing a *prima facie* case creates

25   a presumption that the plaintiff's employer undertook the challenged employment action because of

26

the plaintiff's race.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  To rebut this presumption, the defendant must produce admissible evidence showing that the defendant undertook the challenged employment action for a "legitimate, nondiscriminatory reason." *Id.*  If the defendant does so, then "the presumption of discrimination 'drops out of the picture'" and the plaintiff may defeat summary judgment only by satisfying the usual standard of proof required in civil cases under Fed. R. Civ. P. 56(c).  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).  In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race.  *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

The Supreme Court has identified two methods by which a plaintiff claiming disparate treatment can meet the standard of proof necessary to defeat summary judgment.  First, the plaintiff may offer evidence, direct or circumstantial, "that a discriminatory reason more likely motivated the employer" to make the challenged employment decision.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Alternatively, the plaintiff may offer evidence "that the employer's proffered explanation is unworthy of credence." *Id.*  The Ninth Circuit Court of Appeals has clarified that with respect to the second method, a plaintiff may defeat a defendant's motion for summary judgment by offering proof that the employer's legitimate, nondiscriminatory reason is actually a pretext for racial discrimination.  *See McGinest*, 360 F.3d at 1123; *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1067 (9th Cir. 2004); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641-42 (9th Cir. 2004); *Wallis*, 26 F.3d at 889-90.  However, the Court of Appeals reminds district courts that a plaintiff may not defeat summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action.  *See Wallis*, 26 F.3d at 890; *Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986).  Nor may a plaintiff create a

genuine issue of material fact by relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted. *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (concluding that despite the plaintiff's claims that she had performed her job well, that "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact").

In the instant case, plaintiff has failed to establish a *prima facie* case of intentional discrimination.  While plaintiff can establish that he is a member of a protected class based on race, and that he was terminated from his employment position, defendants argue that he cannot meet the second or fourth elements establishing a *prima facie* case.  The Court agrees that plaintiff cannot establish the fourth element.

Plaintiff has failed to provide evidence that others who were similarly situated, but not members of a protected class, were treated better than he was.  Plaintiff first points to probationary CI Grinshell, a Caucasian, who was also terminated for poor performance.  Plaintiff argues that CI Grinshell received more training than he did, was given written forms of counseling when problems arose, and received shadowing supervisors.  The Court first notes that it is questionable whether CI Grinshell may be considered an appropriate comparator.  He had a different supervisor than plaintiff, and there is no evidence that he displayed similar conduct as plaintiff.  *See Vasquez*, 349 F.3d at 642 n. 17 (holding that, "to be similarly situated, an employee must have the same supervisor, be subject to the same standards, and have engaged in the same conduct."); *but see Aragon*, 292 F.3d at 660 (emphasizing that a comparator must be similarly situated in all material respects, not necessarily in all respects).  Regardless of whether CI Grinshell is an appropriate comparator, the Court is not convinced for purposes of this analysis that he was actually treated differently than plaintiff, as CI Grinshell was also terminated from his position due to poor performance.

Plaintiff then points to CI Don Winchell, also a Caucasian, arguing that CI Winchell received more training than he did.  Specifically, plaintiff asserts that CI Winchell was offered the opportunity

MEMORANDUM ORDER
PAGE - 8

1  to return to the academy for training after he failed out.  Setting aside the fact that plaintiff relies

2  solely on hearsay for this argument, plaintiff also does not explain how CI Winchell is similarly

3  situated to him.  CI Winchell had a different supervisor, and plaintiff was also allowed to retake the

4  two courses that he had failed at the academy.  Furthermore, nothing about plaintiff's termination

5  suggests that it at all related to his performance at the academy.

6        Finally, plaintiff points to CI Burton Paddie and CI Erin Burke, both of whom apparently

7  wrongfully extracted people from their vehicles, but were not terminated.  Plaintiff does not provide

8  any other information about these comparators.  He provides no disciplinary history for either one,

9  nor does he explain how else they were similarly situated to him.  Indeed, only CI Paddie was a

10  probationary CI.  CI Burke was not.  Furthermore, it is evident from the record that plaintiff was not

11  terminated based on the sole incident involving the wrongful extraction.

12        Accordingly, the Court finds that plaintiff has not demonstrated that other similarly-situated

13  employees who were not members of the protected class were treated more favorably than he was.

14  For that reason, the Court also finds that plaintiff has failed to make a *prima facie* case of wrongful

15  termination.

16        However, plaintiff argues that he need not establish a *prima facie* case of discrimination

17  through the traditional *McDonnel Douglas* elements in order to defeat summary judgment, as long as

18  he can prove discriminatory intent through specific and substantial circumstantial evidence.  In

19  *McGinest*, *supra*, the Ninth Circuit Court of Appeals explained:

20        Our decision in *Costa* establishes that although the *McDonnell Douglas* burden
           shifting framework is a useful 'tool to assist plaintiffs at the summary judgment
21        stage so that they may reach trial,' 'nothing compels the parties to invoke the
           *McDonnell Douglas* presumption.'   Rather, when responding to a summary
22        judgment motion, the plaintiff is presented with a choice regarding how to
           establish his or her case. McGinest may proceed by using the *McDonnell Douglas*
23        framework, or alternatively, may simply produce direct or circumstantial evidence
           demonstrating that a discriminatory reason more likely than not motivated GTE.

24

25  *McGinest*, 360 F.3d at 1122.  Thus, the Court turns to plaintiff's argument that Chief Stanford's

26  actions clearly demonstrate a racial bias against him.  For the reasons discussed below, the Court

1   finds that plaintiff fails to make such a showing, either directly or circumstantially.

2         Plaintiff has offered no direct evidence of discriminatory intent.  Instead, plaintiff's

3   allegations of discrimination appear to be aimed solely at Chief Stanford, and based solely on

4   circumstantial evidence.  Plaintiff first asserts that Chief Stanford directed racial animosity toward

5   him on several occasions.  Specifically, he alleges that Chief Stanford allowed white CIs to leave

6   work early before allowing any of the black CIs to leave work early.  However, plaintiff has also

7   conceded that he remembers that happening only once, and that was after Chief Sanford had already

8   recommended that plaintiff be terminated.

9         Plaintiff also states that Chief Stanford directed menacing glares and "bad, nasty looks,"

10  toward him, demonstrating racial bias.  However, plaintiff provides no specifics about those

11  incidents, and it is not clear whether each incident was isolated or when the incidents allegedly

12  occurred.

13        More importantly, plaintiff ignores the fact that Chief Stanford was not the final authority in

14  the decision to terminate plaintiff.  Indeed, Chief Stanford first went to Ms. Fearon recommending

15  that plaintiff be terminated.  She then made a recommendation to the Labor and Employment

16  Relations office, who then made a presentation to Mr. Hardy.  Mr. Hardy conducted his own

17  independent analysis of plaintiff's performance and the various complaints received.  Mr. Hardy

18  states that he made his decision based on reports from multiple supervisors whom he believed to be

19  balanced and objective.  In *Vasquez, supra*, the Court of Appeals explained that if a plaintiff fails to

20  provide evidence demonstrating a nexus between the alleged discriminatory actions and the

21  subsequent adverse employment decision made by another person, that plaintiff must proceed under

22  the traditional *McDonnell Douglas* framework.

23        The only evidence Vasquez offers are the remarks of Berglund.  However,
     Berglund was not the decisionmaker, and Vasquez has offered no evidence of

24   discriminatory remarks made by Leeds.  Therefore, Vasquez must show a nexus
     between Berglund's discriminatory remarks and Leeds' subsequent employment

25   decisions.  Vasquez has not shown the necessary nexus because Leeds conducted
     her own thorough investigation, and as mentioned above, Vasquez presents no

26

MEMORANDUM ORDER
PAGE - 10

1    evidence that discriminatory animus motivated Leeds' decision.  To the extent that
     Berglund's remarks and Leeds' knowledge of prior conflicts between Vasquez and
2    Berglund constitute circumstantial evidence of discriminatory intent, this evidence
     is insufficient to make out a prima facie case.  Therefore, Vasquez must proceed
3    under the *McDonnell Douglas* framework.

4    *Vasquez*, 349 F.3d at 640-41.

5           The Court has already explained above that plaintiff fails to make a *prima facie* case under

6    the *McDonnel Douglas* framework.  Accordingly, the Court finds that plaintiff has failed to raise an

7    issue of genuine material fact with respect to his disparate treatment claim, and therefore, his claim

8    must be dismissed.

9                                          **III. CONCLUSION**

10          Having reviewed defendants' motion for summary judgment (Dkt. #22), plaintiff's opposition

11   (Dkt. #32), defendants' reply (Dkts. #37), the declarations and evidence in support of those briefs,

12   and the remainder of the record, the Court hereby ORDERS:

13          (1)  Defendants' motion for summary judgment (Dkt. #22) is GRANTED in its entirety, and

14   plaintiff's claim is DISMISSED with prejudice.  This case is now CLOSED.

15          (2)  The Clerk shall forward a copy of this Memorandum Order to all counsel of record.

16          DATED this 8th day of September, 2006.

17

18

19                                          RICARDO S. MARTINEZ
                                            UNITED STATES DISTRICT JUDGE
20

21

22

23

24

25

26

MEMORANDUM ORDER
PAGE - 11